1  **LOWENSTEIN SANDLER LLP**
2  Katie R. Glynn (Bar No. 300524)
   390 Lytton Avenue
3  Palo Alto, CA 94301
   Telephone: 415-288-4545
4  Fax: 415-288-4534
5  kglynn@lowenstein.com

6  Lawrence M. Rolnick (*pro hac vice to be filed*)
   Marc B. Kramer (*pro hac vice to be filed*)
7  1251 Avenue of the Americas
   New York, NY 10020
8  Telephone: 212-262-6700
   Fax: 973-597-2381
9  lrolnick@lowenstein.com
   mkramer@lowenstein.com
10

11 *Counsel for the Valinor Plaintiffs*

12                **UNITED STATES DISTRICT COURT**

13                **NORTHERN DISTRICT OF CALIFORNIA**

14

15

16 | VALINOR CAPITAL PARTNERS, L.P., | ) |
   | VALINOR CAPITAL PARTNERS | ) | Case No. _____
17 | OFFSHORE MASTER FUND, L.P.; and | ) |
   | VALINOR CAPITAL PARTNERS SPV | ) |
18 | VI LLC | ) | **COMPLAINT FOR VIOLATIONS**
   |  | ) | **OF THE FEDERAL SECURITIES**
19 |                    Plaintiffs | ) | **LAWS AND THE COMMON LAW**
   |  | ) |
20 |  | ) |
   |        vs. | ) |
21 |  | ) |
   |  | ) |
22 | LENDINGCLUB CORPORATION, | ) |
   | RENAUD LAPLANCHE, and CARRIE | ) | DEMAND FOR JURY TRIAL
23 | L. DOLAN, | ) |
   |  | ) |
24 |                    Defendants. | ) |

25

26

27

28

                    COMPLAINT FOR VIOLATIONS OF THE
               FEDERAL SECURITIES LAWS AND THE COMMON LAW

Plaintiffs Valinor Capital Partners, L.P., Valinor Capital Partners Offshore Master Fund, L.P., and Valinor Capital Partners SPV VI LLC (collectively, "the Valinor Plaintiffs" or "Plaintiffs") are investment funds or similar entities that purchased the securities of Defendant LendingClub Corporation ("LendingClub" or the "Company"). Plaintiffs, through their undersigned attorneys, by way of this Complaint and Jury Demand, sue LendingClub and certain of its former officers and directors (together, "Defendants"), and allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.

Plaintiffs' information and belief is based on, *inter alia*, an investigation by their attorneys, which investigation includes, among other things, a review and analysis of: LendingClub's filings with the U.S. Securities and Exchange Commission ("SEC"); Company releases, conference calls, public statements by defendants, media reports, analyst reports, pleadings, motion papers, and exhibits to declarations filed in the matter *In re LendingClub Securities Litigation*, 16-cv-02627-WHA (N.D. Cal.) or other actions against LendingClub, public documents concerning LendingClub, and documents received directly from LendingClub seeking to induce Plaintiffs to invest  in the Company or its loan products.  Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their custody and/or control.   Plaintiffs believe that further substantial evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     Plaintiffs bring this action under the federal securities laws and under the common law to recover the investment losses they suffered as a result of numerous false and misleading statements that LendingClub and its executives made to induce Plaintiffs to purchase LendingClub securities.   Defendants' misrepresentations to Plaintiffs caused Plaintiffs to suffer significant investment losses when the truth about Defendants'

misrepresentations was revealed and the price of LendingClub's securities plummeted as a result.

2.      Plaintiffs were early investors in LendingClub, making numerous pre-IPO investments in a variety of LendingClub securities.  Plaintiffs bought hundreds of millions of dollars' worth of LendingClub securities, both pre and post-IPO, and were at times one of LendingClub's largest shareholders.

3.      But what Plaintiffs did not know was that LendingClub was concealing critical facts from them – and the broader market.  LendingClub was concealing that the Company had numerous internal control deficiencies (to the point that senior executives could change actual loan data and not be detected) and was artificially pumping up its numbers through a scheme involving a related entity with undisclosed ties to the company, a loan support agreement, and ownership interests held by the Company's then-CEO and a board member.

4.      When, in 2016, LendingClub was forced by events to reveal its control deficiencies, and then press accounts further revealed the related entity and its relationship to LendingClub, the stock fell precipitously and Plaintiffs suffered tens of millions of dollars in damages.

5.      LendingClub is a peer-to-peer lending and alternative investing company that operates as an online marketplace for, on one side, borrowers seeking credit, and on the other side, non-traditional (often retail) lenders seeking to provide credit in exchange for an above market rate of return. LendingClub facilitates a number of loan products, such as unsecured personal loans, refinance loans, small business loans, and education loans.

6.      LendingClub was founded in 2006.  Although not a public company, LendingClub made periodic filings with the United States Securities and Exchange Commission starting in 2008, after filing a form S-1 and issuing hundreds of millions of dollars' worth of "Member Payment Dependent Notes."  The Company also engaged in multiple rounds of financing and raised significant capital.

7.     Plaintiffs invested in a number of pre-IPO LendingClub securities.  Plaintiffs purchased pre-IPO common stock, Preferred Series B stock, and Preferred Series D stock.  In connection with these investments, Plaintiffs received documents and presentations directly from LendingClub.   At the time of Plaintiffs' purchases, Plaintiffs also reviewed LendingClub's then-existing public filings.

8.     LendingClub launched an Initial Public Offering on December 11, 2014, selling tens of millions of shares to the public at $15 each – and the price of its stock climbed rapidly to $28 per share, making it a multibillion dollar company.   Many of Plaintiffs' pre-IPO investments converted into LendingClub common stock as of the IPO, and Plaintiffs then further purchased millions of shares of LendingClub common stock on the secondary market.

9.     From its very start, LendingClub was concealing its deficient internal controls from investors.

10.     Further, since before its IPO until mid-2016, LendingClub also concealed that contrary to its statements, the company was taking on credit risk, had undisclosed related-party relationships, had senior management altering loan applications, and failed to follow its own rules when packaging certain loans for sale to loan investors.

11.     Not only was LendingClub misrepresenting its internal controls environment, but it was also misrepresenting the very nature of its business – telling the world it was purely a marketplace while hiding related party transactions that made it an investor in its own loans.

12.     The Company's duplicity also made its statements regarding loan origination misleading – investors were led to believe LendingClub was experiencing exclusively organic growth, not growth driven in part by LendingClub itself.

13.     Investors were misled by Defendants' misrepresentations, and then harmed as the truth was revealed.

14.     Plaintiffs are investment funds or accounts managed by Valinor Management, L.P. ("Valinor"), an investment advisor based in New York, New York.

15.    From 2012 through 2016, Defendants sought to induce investors – like Valinor – to invest in LendingClub.  Valinor (via Plaintiffs) was an early investor, investing in 2012, and making additional purchases in 2013, 2014, and then after the Company's IPO, purchasing additional shares on the secondary market.

16.    Defendants, by their materially false and misleading misrepresentations, contained in public filings and others statements, would ultimately induce Valinor (via Plaintiffs) to purchase hundreds of millions of dollars of LendingClub securities.

17.    On May 9, 2016, LendingClub admitted that it had a "material weakness" in its internal controls over financial reporting.  The Company, and associated press reports, revealed a litany of previously concealed truths:  undisclosed self-dealing by management, sales of non-conforming loans, and the backdating of loan applications.   These were examples of LendingClub's deficient internal controls – which the Company had been telling the market were effective from the very start.

18.    LendingClub also announced the resignation of its CEO, defendant Renaud Laplanche ("Laplanche"), as well as other senior managers.  The internal control deficiencies resulted in a delay in LendingClub's financial filings, and rendered LendingClub's prior filings impossible to rely on.  On May 9, with the revelation of these facts correcting LendingClub's prior misstatements, LendingClub stock fell $2.48, nearly 35%, causing Plaintiffs millions of dollars in damages. On May 10, as further information was revealed to the market, LendingClub stock fell another $0.52 a share, almost 13%.  Over these two days, LendingClub stock declined over 42%.   The fall in LendingClub's stock is directly attributable to the disclosure of the new and corrective information to the market, specifically, LendingClub's deficient internal controls and the inability of investors to rely on LendingClub's previously filed financials.

19.    Plaintiffs purchased LendingClub securities from 2012 to 2016 in reliance on Defendants' misrepresentations.  In making their decisions to invest in LendingClub securities,

Valinor read, reviewed, listened to, and relied on Defendants' materially misleading statements.

20.     After the IPO, Valinor also relied on the integrity of the market price of LendingClub's common stock.

21.     Valinor was unaware of the falsity of Defendants' statements when Plaintiffs purchased LendingClub securities.

22.     Defendants' misrepresentations caused Plaintiffs to purchase LendingClub securities at artificially-inflated prices. Had it not been for these repeated material misrepresentations – communicated and conveyed to Plaintiffs through public filings, in private documents, and by LendingClub management – Plaintiffs either would not have purchased their LendingClub securities or would not have paid the prices they paid.

23.     When the truth about LendingClub was disclosed to the market, Plaintiffs suffered significant investment losses.

24.     Plaintiffs therefore bring this action to recover the damages suffered as a result of the wrongs committed by Defendants.

## JURISDICTION AND VENUE

25.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and under state common law.

26.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, and has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

27.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391. Many of the acts giving rise to the violations complained of herein, including the dissemination of false and misleading information, occurred in this District.

28.     In connection with the acts, transactions, and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including, but not limited to, the United States mails, interstate telephone communications, and the facilities of a national securities exchange and market.

### PARTIES

#### A.    Plaintiffs

29.    Plaintiff Valinor Capital Partners, L.P. is a limited partnership formed under the laws of the state of Delaware.  The LendingClub securities Valinor Capital Partners, L.P. purchased, and the dates of those purchases, are listed in Exhibit 1.

30.    Plaintiff Valinor Capital Partners Offshore Master Fund, L.P. is a limited partnership formed under the laws of the Cayman Islands. The LendingClub securities Valinor Capital Partners Offshore Master Fund, L.P. purchased, and the dates of those purchases, are listed in Exhibit 2.

31.    Plaintiff Valinor Capital Partners SPV VI LLC is a limited liability company organized under the laws of the state of Delaware.  The LendingClub securities Valinor Capital Partners SPV VI LLC purchased, and the dates of those purchases, are listed in Exhibit 3.

32.    Plaintiffs are managed by a common manager, Valinor, which has a principal place of business in New York, New York.

#### B.    Defendants

33.    Defendant LendingClub is a Delaware corporation with its principal place of business at 71 Stevenson St., San Francisco, CA 94105. LendingClub became a publicly-traded company as a result of a December 2014 IPO.  Before that time, LendingClub was a private company, but one which filed periodic statements with the SEC at all relevant times to this complaint.  Since the IPO, the Company's shares have been listed on the New York Stock Exchange under the ticker symbol "LC."  The Company's headquarters are located in, and it conducts business in, and from, this District.

34.    Defendant Laplanche founded LendingClub and served as its CEO and Chairman of the Board until May 5, 2016, when he resigned, which resignation was announced May 9, 2016. At the times relevant hereto, Laplanche made statements in Company releases,

conference calls, and other public forums as alleged herein, and signed and/or certified the Company's SEC filings pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications"), including, but not limited to, LendingClub's Reports on Forms 10-Q and 10-K.  Laplanche also conducted presentations or otherwise made statements directly to Valinor.

35.    Defendant Carrie Dolan ("Dolan") was the Company's Chief Financial Officer (Principal Financial Officer and Principal Accounting Officer) ("CFO") during the times relevant to this complaint.  Dolan resigned on August 2, 2016.  At the times relevant hereto, Dolan signed the false and misleading Registration Statement, made statements in Company releases and conference calls, and signed and/or certified the Company's SEC filings pursuant to the Sarbanes-Oxley Act of 2002, including, but not limited to, LendingClub's Reports on Forms 10-Q and 10-K.

36.    Laplanche and Dolan oversaw LendingClub's operations and financial controls.

## FACTUAL ALLEGATIONS

### I.    Background of LendingClub

37.    At the times relevant hereto, LendingClub operated as an online marketplace matching borrowers and lenders. The Company facilitates various types of loan products for consumers and small businesses, including unsecured personal loans, consumer loans, unsecured education and patient finance loans, and unsecured small business loans. The Company also offers investors (i.e., "lenders") an opportunity to invest in loans based on term and credit characteristics.

38.    LendingClub's business model focuses on loan origination and servicing. The Company generates revenue "from transaction fees" related to loan origination, and "servicing fees from investors". Loan origination was critical to the Company's business. In the Company's Form 10-K for fiscal year 2015 ("2015 10-K"), it stated:

> We believe originations are a key indicator of the adoption rate of our marketplace, growth of our brand, scale of our business, strength of our network effect, economic competitiveness of our products and future growth. Loan originations have grown significantly over time due to increased awareness of our brand, our high borrower and investor satisfaction rates, the effectiveness of our

borrower acquisition channels, a strong track record of loan performance and the expansion of our capital resources.

39.     LendingClub was viewed as a middleman, maintaining a marketplace where (1) customers borrow to lower the cost of their credit and enjoy a "better experience" than traditional bank lending; and (2) "lenders" earn attractive risk-adjusted returns from an asset class that has generally been closed to individuals and is available to institutional investors on only a limited basis.

40.     Borrowers apply on LendingClub's website and then enter a marketplace where they are potentially matched with users who desire to act as lenders.  The borrower may be matched with a single lender or multiple lenders, who may be funding entire loans, portions of individual loans, and/or portions of pools of loans.

41.     In order to avoid state banking regulations, LendingClub then uses its primary issuing bank partner, WebBank, which simultaneously originates each loan and sells it to LendingClub (at a price that includes modest fees and interest).  LendingClub's business model, as represented to investors, was that LendingClub would buy these loans with the money from its "matched" lenders, and then service the loans – taking no credit risk as it would not be a lender nor own the loans themselves. For its role, LendingClub receives an initial origination fee and then servicing fees on each payment throughout the term of the loan.

42.     This diagram illustrates LendingClub's relationships with "B and a lender, L, as follows: (1) B and L match from the pools of borrowers and lenders in LendingClub's marketplace, (2a) LendingClub directs a partner bank to (2b) initiate a loan to B, which loan the partner bank immediately sells (2c) to LendingClub, paid for with funds (2d) paid to LendingClub by L."



43.    Formed in 2006, LendingClub grew quickly.  By 2008, the Company was publicly filing periodic updates with the SEC and issuing hundreds of millions of dollars in privately placed securities.  By December 2011, according to a LendingClub presentation provided to Valinor, the company had 84 employees, and was originating tens of millions of loans a month.

44.    LendingClub went through multiple capital raises, selling a variety of securities over time.

45.    Relevant hereto, LendingClub sold Series B Preferred Stock on or about March 13, 2009, pursuant to a Series B Preferred Stock Purchase Agreement (the "Series B Agreement"), which was publicly filed along with the Company's 8-K announcing the sale.

46.    LendingClub sold Series D Preferred Stock on or about July 28, 2011, pursuant to a Series D Preferred Stock Purchase Agreement (the "Series D Agreement"), which was publicly filed along with the Company's 8-K announcing the sale.

47.    LendingClub also issued and sold pre-IPO common stock to certain investors.

48.    LendingClub's pre-IPO filings with the SEC, including the Series B Agreement and the Series D Agreement contained, or repeated, untrue statements of material fact and omitted other facts necessary to make statements therein not materially false or misleading.

49.    Defendants completed LendingClub's IPO, utilizing a Form S-1 registration statement, declared effective by the SEC on or about December 11, 2014 (the "Registration

Statement"), raising $1 billion from investors by selling more than 66.7 million shares of LendingClub common stock at $15 per share.

50.     The Registration Statement contained untrue statements of material fact and omitted other facts necessary to make statements therein not materially false or misleading.

51.     LendingClub's subsequent SEC filings on Forms 10-K and 10-Q contained, or repeated, misrepresentations, and omitted other facts necessary to make statements therein not materially false or misleading.

## II.     What LendingClub Told the Market Versus the Truth

52.     LendingClub touted to investors its transparency.

53.     This was true from the very start of Valinor's relationship with LendingClub. In a 2010 "Fact Sheet" created by LendingClub and made available to Valinor, the Company highlighted its "Full Transparency."   In July 2010 presentation materials, LendingClub dedicated an entire slide to its supposed "Full Transparency."

54.     Laplanche repeatedly told the marketplace that LendingClub was a transparent company with a transparent marketplace for loans.

55.     The Company's Registration Statement also stressed transparency, stating:

Benefits to Investors: Transparency. We provide investors with transparency and choice in building their loan portfolios. For each standard program loan, investors can examine credit attributes from the borrower's credit report and borrower-reported attributes prior to investing in a loan and can monitor ongoing loan performance. We also provide access to credit profile data on each approved loan as well as all of the historical performance data for every loan ever invested in through our marketplace. We specifically indicate the information that is verified on our website.

56.     In a letter to investors that was included in the Registration Statement, Laplanche emphasized how LendingClub had established investor confidence through its transparency with both borrowers and loan investors, stating:

Building Confidence

We are not only bringing cost efficiency to the credit markets but also a more transparent and customer-friendly experience. Unlike traditional banks, we do not build confidence by establishing a branch at every street corner. Instead, we earn

the trust of our customers by offering maximum transparency into our products' terms and performance.

57.     But LendingClub was far from transparent.  The Company was downright opaque when it came to information critical to investors, especially investors in an online loan marketplace: the Company's internal controls, and its own interaction with its marketplace.

58.     From the very start through May 2016, LendingClub hid numerous material issues with the Company and its marketplace.

59.     LendingClub presented itself to the market as a solid middleman.  It told the market, repeatedly, that it took no credit risk.  It told the market that it had effective internal controls and that its GAAP reported numbers were accurate.  And it presented itself to the market as a middleman without related parties acting in its own loan pools.

60.     All of this was false, or at least seriously misleading.  LendingClub's GAAP financials were false, and it was taking on credit risk via an undisclosed related party entity called Cirrix – an entity with which it had a credit support arrangement.  Cirrix itself was investing in LendingClub loans, with LendingClub's money, meaning LendingClub was not the true middleman it presented itself as. Rather, LendingClub was a participant in its own marketplace.  And as for its internal controls, LendingClub was concealing from the market that senior executives were able to modify loan data – the very lifeblood of a loan marketplace – and manipulate the data to try and pull the wool over the eyes of a counterparty.

### III.    LendingClub's False and/or Misleading Statements Regarding Internal Controls

61.     In May 2016, LendingClub disclosed to the market that it had a "material weakness" in its internal controls, specifically its internal controls over financial reporting, at least as of December 31, 2015.

62.     This admission partially corrected LendingClub's representations regarding the effectiveness of its internal controls going back to its Registration Statement. Defendant Laplanche would later describe the problem as a "fairly significant compliance issue."

63.     Prior to May 2016, LendingClub had *never* – since it had started making periodic reports with the SEC in 2008 – disclosed any material weakness in its internal controls or material change in its internal controls.

64.     LendingClub had not previously disclosed a change or fix to its internal controls before May 2016.

65.     On information and belief, until LendingClub disclosed (and stated it fixed) the material weaknesses in its internal controls in May of 2016, those weaknesses existed in LendingClub's internal controls.

A.      **Pre-IPO Statements as to Internal Controls**

66.     On information and belief, the same material weakness in LendingClub's internal controls disclosed in May 2016 existed at least as of June 29, 2011, when LendingClub filed its Form 10-K for the period ending March 31, 2011 (the "2010 Form 10-K").

67.     In particular, from March 31, 2011, to May 2016, LendingClub never disclosed a material change to its internal controls and never indicated that it had performed a reassessment or correction of its internal controls procedures during that time.

68.     As explained further below, examples of failures of LendingClub's internal controls also dated back to *2009*, when Laplanche was able to engage in improper transactions as well as March 2011, when certain funds managed by a LendingClub related entity were not properly recording their valuations in accordance with GAAP.  On information and belief, these pre-IPO examples of internal control failures were neither disclosed nor corrected until May 2016 or later, and existed at least as of March 2011.

69.     In its 2010 Form 10-K, LendingClub stated:

As required by Exchange Act Rule 13a-15(b), we carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the fiscal year covered by this report. Based on the foregoing, our Chief Executive Officer and Chief Financial Officer, have concluded that our disclosure controls and procedures were effective at the reasonable assurance level.

> Based on our assessment, management did not identify any material weaknesses or significant deficiencies in our system of internal controls over financial reporting as of March 31, 2011. There has been no change in our internal control over financial reporting during our most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

70.     In its Forms 10-Q for the quarters ending June 30, 2011 (filed August 15, 2011), ending September 30, 2011 (filed November 14, 2011), December 31, 2011 (filed February 14, 2012), LendingClub stated:

> As required by Exchange Act Rule 13a-15(b), we carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the fiscal quarter covered by this report. Based on the foregoing, our Chief Executive Officer and Chief Financial Officer, have concluded that our disclosure controls and procedures were effective at the reasonable assurance level.

> **There has been no change in our internal control over financial reporting** during our most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

71.     On information and belief, the same material weakness in LendingClub's internal controls disclosed in May 2016 existed at least as of June 29, 2012, when LendingClub filed its Form 10-K for the period ending March 31, 2012 (the "2011 Form 10-K") (later amended as of July 31, 2012, without change to the section below).

72.     In its 2011 Form 10-K, LendingClub stated:

> [w]e discovered no material weaknesses in internal control over financial reporting at March 31, 2012.

> . . .

> As required by Exchange Act Rule 13a-15(b), we carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the fiscal year covered by this report. Based on the foregoing, our Chief Executive Officer and Chief Financial Officer, have concluded that our disclosure controls and procedures were effective at the reasonable assurance level.

> . . .

There has been no adverse change in our internal control over financial reporting during our most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

73.     In its Forms 10-Q for the quarters ending June 30, 2012 (filed August 14, 2012), and ending September 30, 2012 (filed November 14, 2012), LendingClub stated:

As required by the Exchange Act Rule 13a-15(b), we carried out an evaluation, under the supervision and with the participation of management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the quarter covered by this report. Based on the foregoing, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective.

**There has been no adverse change in our internal control over financial** reporting during our most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

74.     On information and belief, the same material weakness in LendingClub's internal controls disclosed in May 2016 existed at least as of April 1, 2013, when LendingClub filed its Form 10-K for the period ending December 31, 2012 (the "2012 Form 10-K").

75.     In its 2012 Form 10-K, LendingClub stated:

[w]e discovered no material weaknesses in internal control over financial reporting at December 31, 2012

. . .

As required by Exchange Act Rule 13a-15(b), we carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures as of December 31, 2012. Based on the foregoing, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of December 31, 2012.

. . .

There has been no adverse change in our internal control over financial reporting during our most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

76.     In its Form 10-Q for the quarter ending March 31, 2013 (filed May 15, 2013), LendingClub stated:

As required by the Exchange Act Rule 13a-15(b), we carried out an evaluation, under the supervision and with the participation of management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the quarter covered by this report. Based on the foregoing, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective.

**There has been no adverse change in our internal control over financial reporting** during our most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

77.     In its Forms 10-Q for the quarters ending June 30, 2013 (filed August 9, 2013), and ending September 30, 2013 (filed November 14, 2013), LendingClub stated:

As required by Rule 13a-15(b) of the 1934 Act, we carried out an evaluation, under the supervision and with the participation of management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the quarter covered by this report. Based on the foregoing, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective at a reasonable assurance level.

**There has been no adverse change in our internal control over financial reporting** during our most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

78.     On information and belief, the same material weakness in LendingClub's internal controls disclosed in May 2016 existed at least as of March 31, 2014, when LendingClub filed its Form 10-K for the period ending December 31, 2013 (the "2013 Form 10-K").

79.     In its 2013 Form 10-K, LendingClub stated:

[W]e discovered no material weaknesses in internal control over financial reporting at December 31, 2013

. . .

As required by Rule 13a-15(b) of the 1934 Act, we carried out an evaluation, under the supervision and with the participation of management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures as of December 31, 2013. Based on the foregoing, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective at a reasonable assurance level.

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as such term is defined in Rule 13a-15(f) under the 1934 Act.

. . .

Our management, including the Chief Executive Officer and Chief Financial Officer, has assessed the effectiveness of our internal control over financial reporting as of December 31, 2013, following the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in the 1992 Internal Control—Integrated Framework, and with further guidance for internal controls for small business provided by the SEC's new Interpretive Guidance in Release No. 34-55929.

80.    In its Forms 10-Q for the quarters ending March 31, 2014 (filed May 15, 2014), and June 30, 2014 (filed August 14, 2014), LendingClub stated:

As required by Rule 13a-15(b) of the Exchange Act, we carried out an evaluation, under the supervision and with the participation of management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the quarter covered by this report. Based on the foregoing, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective at a reasonable assurance level.

**There has been no adverse change in our internal control over financial reporting** during our most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

81.    In its Forms 10-Q for the quarter ending September 30, 2014 (filed November 5, 2014), LendingClub stated:

As required by Rule 13a-15(b) of the Exchange Act, we carried out an evaluation, under the supervision and with the participation of management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the quarter covered by this report. Based on the foregoing, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective at a reasonable assurance level.

**There were no changes that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting during our most recent fiscal quarter**.

82.    In each of the Form 10-Ks for 2010, 2011, 2012, and 2013, LendingClub stated that it found no material weakness in its internal controls and that it had effective disclosure

controls and internal controls over financial reporting.  In each 10-Q filed in between those Forms 10-K, LendingClub stated that there were no adverse changes to its internal controls.

83.     On information and belief, and based in part on LendingClub's admissions in May 2016, LendingClub had a material weakness in its internal controls over financial reporting as of the time of the filing of each of the Form 10-Ks for 2010, 2011, 2012, and 2013, as well as of the time of the filing of each of the interim 10-Qs.  LendingClub omitted its material weakness from each and every one of these filings.

84.     LendingClub also stated in each of its Form 10-Ks for 2010, 2011, 2012, and 2013, as well as the interim 10-Qs, that it had effective disclosure controls and procedures.  On information and belief, the material weaknesses in LendingClub's internal controls included material weaknesses in disclosure controls and procedures going back to at least the 2010 Form 10-K.

85.     The flaws in LendingClub's internal controls were not corrected at any time pre-IPO.

86.     The material weaknesses in LendingClub's internal controls were not disclosed at any time pre-IPO.

87.     Plaintiffs did not discover, and could not have discovered by the exercise of reasonable diligence, the false or misleading statements made by LendingClub until LendingClub itself revealed the material weaknesses in its internal controls in May of 2016.

88.     LendingClub made false or misleading representations regarding its internal controls in pre-IPO documents.

89.     Plaintiffs purchased LendingClub securities, including pre-IPO securities, on multiple dates, as stated in the exhibits to the complaint, in reliance on LendingClub's pre-IPO statements.

### B.      Statements Further Connected to Preferred Stock Series B and D

90.      Among its pre-IPO capital raises, LendingClub sold Preferred Stock Series B and D.  Valinor purchased LendingClub Preferred Series B and D Stock on the dates stated in Exhibits 1 to 3.

91.      In connection with the sale of Preferred Series B Stock, LendingClub publicly filed a Stock Purchase Agreement dated March 13, 2009 (filed March 19, 2009) (the "Series B Agreement").

92.      In connection with the sale of Preferred Series D Stock, LendingClub publicly filed a Stock Purchase Agreement dated July 28, 2011 (filed August 3, 2011) (the "Series D Agreement").

93.      In the Series B Agreement, LendingClub represented:

**3.29 Internal Control Over Financial Reporting; Disclosure Controls and Procedures.**

(a) The Company maintains a system of internal control over financial reporting (as such term is defined in Rule 13a-15(f) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) that complies with the requirements of the Exchange Act and has been designed by the Company's principal executive officer and principal financial officer, or under their supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. Except as disclosed in the Schedule of Exceptions, the Company's internal control over financial reporting is effective and the Company is not aware of any material weaknesses in its internal control over financial reporting.

. . .

(c) The Company maintains disclosure controls and procedures (as such term is defined in Rule 13a-15(e) under the Exchange Act) that comply with the requirements of the Exchange Act; such disclosure controls and procedures have been designed to ensure that material information relating to the Company and its subsidiaries is made known to the Company's principal executive officer and principal financial officer by others within those entities; and such disclosure controls and procedures are effective.

94.      On information and belief, at the time of the Series B Agreement, the material weaknesses in LendingClub's internal controls revealed in May 2016 existed, were omitted and undisclosed.

95.     As of the time of Plaintiffs' purchases of LendingClub securities, LendingClub had not corrected the representations in the Series B Agreement.  The Series B Agreement was a continuing representation up to and including the time Plaintiffs purchased LendingClub securities.

96.     At no time, from the filing of the Series B Agreement, until May 2016, did LendingClub tell investors of a material change to its internal controls.

97.     This representation, contained in the Series B Agreement, was false or materially misleading.

98.     As of the time of Plaintiffs' purchases of LendingClub securities, LendingClub had not corrected the representations in the Series B Agreement.

99.     In the Series D Agreement, publicly filed on or about August 3, 2011, LendingClub represented:

> **3.6 Company SEC Reports.** The Company has filed all forms, reports and documents with the Securities and Exchange Commission that have been required to be filed by it under applicable laws since October 10, 2008 (all such forms, reports and documents, together with all exhibits and schedules thereto, the "Company SEC Reports"). As of its filing date, each Company SEC Report complied as to form in all material respects with the applicable requirements of the Securities Act of 1933, as amended (the "Securities Act"), and the rules and regulations promulgated thereunder, or the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder (the "Exchange Act"), as the case may be, each as in effect on the date such Company SEC Report was filed. As of its filing date (or, if amended or superseded by a filing prior to the date of this Agreement, on the date of such amended or superseded filing), each Company SEC Report did not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading.

100.     This representation, contained in the Series D Agreement, was false.

101.     The Company's prior SEC reports did contain untrue statements of material fact and/or omitted material facts necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading.  In particular, the Company stated its disclosure controls and procedures were effective, when, in reality, they

were not.  The Company also failed to disclose the material weaknesses in its internal controls, including but not limited to that Laplanche had engaged in self-dealing transactions in 2009 and that the Company had misstated the proper valuation of certain LendingClub Advisors ("LCA") managed funds in 2011.

102.    In the Series D Agreement, LendingClub further represented:

**3.29 Internal Control over Financial Reporting; Disclosure Controls and Procedures.**

(a) The Company maintains a system of internal control over financial reporting (as such term is defined in Rule 13a15(f) under the Exchange Act) that complies with the requirements of the Exchange Act and has been designed by the Company's principal executive officer and principal financial officer, or under their supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. . . . the Company is not aware of any material weaknesses in its internal control over financial reporting.

(b) Since the date of the filing of the Company's Form 10-Q for the quarterly period ended December 31, 2009, there has been no change in the Company's internal control over financial reporting that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

(c) The Company maintains disclosure controls and procedures (as such term is defined in Rule 13a-15(e) under the Exchange Act) that comply with the requirements of the Exchange Act; such disclosure controls and procedures have been designed to ensure that material information relating to the Company and its subsidiaries is made known to the Company's principal executive officer and principal financial officer by others within those entities in a manner to allow timely decisions regarding required disclosure; and such disclosure controls and procedures are effective.

103.    At no time, from the filing of the Series D Agreement, until May 2016, did LendingClub tell investors of a material change to its internal controls.

104.    On information and belief, at the time of the Series D Agreement, the material weaknesses in LendingClub's internal controls revealed in May 2016 existed, were omitted and undisclosed.

105.    This representation, contained in the Series D Agreement, was false or materially misleading.

106.   At the time of the Series D Agreement, LendingClub was also improperly inflating certain asset values (discussed more fully below).  The Series D Agreement did not disclose this overstatement.  The representations in the Series D Agreement, including but not limited to the representations contained in Section 3.5, were thus rendered materially misleading or false.

107.   As of the time of Plaintiffs' purchases of LendingClub securities, LendingClub had not corrected the representations in the Series D Agreement.  The Series D Agreement was a continuing representation up to and including the time Plaintiffs purchased LendingClub securities.

108.   Plaintiffs purchased LendingClub securities, including pre-IPO securities, on multiple dates, as stated in the exhibits to the Complaint, in reliance on LendingClub's pre-IPO statements, including in reliance on the publicly filed Series B and D Agreements.

109.   Plaintiffs' pre-IPO securities, specifically the pre-IPO common stock, Series B Preferred Stock, and Series D Preferred Stock, converted into LendingClub common stock as of the IPO.  Plaintiffs thereby held LendingClub post-IPO common stock and then purchased further post-IPO common stock.

C.   **The 2014 Registration Statement**

110.   The 2014 Registration Statement incorporated the following statement from LendingClub's Q3 2014 Form 10-Q entitled "Controls and Procedures," which confirmed the adequacy of the LendingClub's internal controls over its financial reporting, stating:

> As required by Rule 13a-15(b) of the Exchange Act, we carried out an evaluation, under the supervision and with the participation of management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the quarter covered by this report. Based on the foregoing, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosures controls and procedures were effective at a reasonable assurance level.

111.   In its May 2016 admission, LendingClub admitted that, contra to its statements that its controls could provide "reasonable assurance," in fact its internal controls were inadequate to provide reasonable assurance that:  (a) the Company maintained an effective

control environment, compliance with the Company's Code of Conduct and Ethics Policy, and set an appropriate "tone at the top"; (b) related-party transactions were disclosed to the Company's reporting function; (c) the Company's loans conformed to loan investors' purchase requirements; and (d) there were full and required communications by management to the Company's risk and financial accounting departments, and appropriate oversight of investor contract amendments, particularly for those that could require material changes to the Company's financial statements.

112.    On information and belief, and as further explained herein, the internal controls weaknesses admitted in May 2016 existed at least as of the time of the 2014 Registration Statement.

D.    **Post-Registration Statement Statements Regarding Internal Controls**

113.    In each of LendingClub's Forms 10-Q and 10-K, from the date of the 2014 Registration Statement, through May 9, 2016, LendingClub never identified a change in its internal controls or a weakness that was remediated.

114.    On May 5, 2015, LendingClub filed a Quarterly Report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2015 (the "Q1 2015 Form 10-Q"). The Q1 2015 Form 10-Q contained signed SOX Certifications by the Individual Defendants, stating that the financial information contained in the Q1 2015 Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

115.    LendingClub stated in its Q1 2015 Form 10-Q:  "No change in the Company's internal control over financial reporting (as defined in Rule 13a-15(f) under the Securities Exchange Act of 1934) was identified during the three months ended March 31, 2015, that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting."  This period covered the time between LendingClub's IPO in December 2014, based on the false and misleading registration statement, to the Q1 2015 Form 10-Q.

116.    The Q1 2015 Form 10-Q also added:

The management of the Company, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934) as of March 31, 2015. Based on this evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures were effective as of March 31, 2015.

117.    LendingClub stated in its Q2 2015 Form 10-Q, filed on August 5, 2015:  "No change in the Company's internal control over financial reporting (as defined in Rule 13a-15(f) under the Securities Exchange Act of 1934) was identified during the first half of 2015, that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting."   This period covered the time between the false and misleading Q1 2015 Form 10-Q to the Q2 2015 Form 10-Q.

118.    The Q2 2015 Form 10-Q also added:

The management of the Company, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934) as of June 30, 2015. Based on this evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures were effective as of June 30, 2015.

119.    LendingClub stated in its Q3 2015 Form 10-Q, filed on November 3, 2015:  "No change in the Company's internal control over financial reporting (as defined in Rule 13a-15(f) under the Securities Exchange Act of 1934) was identified during the first nine months of 2015, that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting."   This period covered the time between the false and misleading Q2 2015 Form 10-Q to the Q3 2015 Form 10-Q

120.    The Q3 2015 Form 10-Q also added:

The management of the Company, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure controls and procedures (as define in Rule 13a-15(e) under the Securities Exchange Act of 1934) as of September 30, 2015. Based on this evaluation, the Company's Chief Executive Officer and Chief Financial

Officer have concluded that the Company's disclosure controls and procedures were effective as of September 30, 2015.

121.     Defendant Dolan certified, in LendingClub's 2015 Form 10-K, filed on or about February 22, 2016, that LendingClub had "[d]isclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an Annual Report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;" – no change in internal control was described in the 10-K. The 2015 Form 10-K covered the entirety of 2015, going back to LendingClub's IPO in December 2014, which was based upon the false and misleading 2014 Registration Statement.

122.     As with the 2014 Registration Statement, in the 2015 Form 10-K, management represented that LendingClub's internal controls over financial reporting were effective:

> The Company's management is responsible for maintaining effective internal control over financial reporting and for assessing the effectiveness of internal control over financial reporting, as defined in Rule 13a-15(f) of the 1934 Act. Under the supervision and with the participation of the Company's Chief Executive Officer and Chief Financial Officer, management conducted an evaluation of the effectiveness of its internal control over financial reporting as of December 31, 2015, based on the criteria established in *Internal Control – Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission. As a result of this assessment, management concluded that, as of December 31, 2015, our internal control over financial reporting was effective in providing reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

123.     Laplanche and Dolan signed SOX Certifications of LendingClub's 2014 Form 10-K, Q1-Q3 2015 Forms 10-Q and 2015 Form 10-K. In their SOX Certifications, Laplanche and Dolan certified, among other things, that they had reviewed each report and that:

> Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

> Based on my knowledge, the consolidated financial statements, and other financial information included in this report, fairly present in all material respects

the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures . . . ; and

The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of director (or persons performing the equivalent functions):

All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and b) Any fraud whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

124.    The statements above, as well as the SOX Certifications, were materially false and materially misleading when made.   At the time each statement above was made, LendingClub in fact had material weaknesses in its internal controls – which the Company admitted in May 2016.

**E.    Deficiencies in LendingClub's Internal Controls Render the Above Statements False or Misleading**

125.    LendingClub's deficient internal controls are shown by multiple examples.

126.    In *December 2009*, Laplanche artificially inflated loan origination volume by taking out loans for himself and 3 of his family members, amounting to nearly 10% of LendingClub's market activity for the entire month. The Company has admitted these loans were inappropriate and were made in order to "help increase reported platform loan volume."

127.    LendingClub admitted that, in violation of Generally Accepted Accounting Principles ("GAAP"), it improperly inflated net asset values for six private investment funds managed by LendingClub's subsidiary, LCA, from *March 2011* through May 2016.

128.    Laplanche's December 2009 actions, and the improper inflation of net asset values, both pre date LendingClub's IPO and render LendingClub's Forms 10-K for 2010, 2011, 2012, and 2013 false or materially misleading.

129.    LendingClub's Quarterly Report on Form 10-Q for the quarter ended September 30, 2016 (the "Q3 2016 Form 10-Q") states:

> The investment assets held by the Funds are essentially loans facilitated through the Company's platform and are "level 3 assets", for which no quoted market price is available and whose fair value is therefore subjective and is determined by [LendingClub Advisors] estimates and calculations.

> The Company determined that adjustments were made to the valuation of the Funds' assets that were not consistent with generally accepted accounting principles. These adjustments affected the direction and the specific return reported in monthly statements sent to limited partners.

130.    By inflating the value of these assets in violation of GAAP, LendingClub reported inflated economic returns of the funds and thereby overcharged limited partners.

131.    LendingClub's lack of effective internal controls is also demonstrated by the fact that senior managers were able to alter loan information in a live database – something else LendingClub has admitted.

132.    During the relevant period, and as revealed by news reports on May 9th and 10th 2016, LendingClub had been attempting to package and sell loans to institutional investors, including Jefferies.  Jefferies, in turn, according to news reports, intended to bundle the LendingClub loans into securities.

133.    In reviewing the loans, Jefferies informed LendingClub that it wanted LendingClub to improve the disclosures LendingClub was making to customers.  Jefferies' concern, according to news reports, was that LendingClub had the right under its loan documents to access customer financial data and even sign promissory notes on customers' behalf, but that this was not clearly disclosed in a way Jefferies required.

134.    LendingClub agreed to make the change and changed its disclosures in some loans as of a certain date.  In effect, Jefferies or any buyer would have presumed that for loans after that date, the loans contained the updated disclosure language.

135.    But in order to maximize its loan sale to Jefferies, LendingClub executives backdated loans to a date before the disclosure date change – but without changing the actual disclosures.  Jefferies was thereby tricked into purchasing millions of dollars of loans that did

not have the disclosures Jefferies required; and LendingClub executives had shown that they could alter fundamental information about loans – in this case, the very date of the loan – in LendingClub's live systems, without, apparently, triggering LendingClub's (deficient) internal controls.

136.    The backdating was widespread. Over $22 million in near prime loans were sold to Jefferies, with large portions being backdated and thus not meeting Jefferies' requirements.  The sale of these non-conforming loans to Jefferies should not have occurred.

137.    LendingClub would later engage an outside consultant, who would identify hundreds of instances of loan backdating. As one news report revealed, LendingClub forged loan documents that could have been used by either borrowers, or Jefferies, to void the contracts, leaving LendingClub on the hook.

138.    The backdating and alteration of loans, especially in a live database being used to market and sell the loans, should not have occurred if the Company had effective internal controls in place.

139.    Alterations to loans, backdating, and sale of non-conforming loans to an investor are all examples of LendingClub's internal controls failures.

140.    LendingClub, Laplanche, and Dolan knew or recklessly disregarded that material weaknesses in LendingClub's internal controls meant that Laplanche and other senior managers were able to and did engage in undisclosed related-party transactions, sell non-conforming loans to investors, backdate loan applications, and render inaccurate the Company's financial reporting.

141.    LendingClub and Laplanche knew or recklessly disregarded that LendingClub's reported loan originations, loan originations growth, revenues/fees, and EPS all included undisclosed related-party transactions with Cirrix, as discussed more fully below.

142.    LendingClub and Laplanche knew or recklessly disregarded that contrary to its stated business model, LendingClub assumed material credit and liquidity risks, including tens of millions of dollars in a credit-support agreement with Cirrix.

143.    LendingClub, Laplanche, and Dolan knew or recklessly disregarded that LendingClub's "tone at the top" was not one that emphasized best business practices or honest and complete disclosures.

144.    None of these examples of internal controls weaknesses were disclosed to investors until LendingClub admitted in May of 2016 that it had material weaknesses in its internal controls.

**IV.    LendingClub Fails to Disclose Cirrix – Additionally Rendering Its Credit Risk and Loan Origination Statements False or Misleading**

**What LendingClub Said About Taking *Credit Risk* (And Didn't Say About Cirrix)**

145.    LendingClub repeatedly told the market that it took no credit risk.  LendingClub also repeatedly told the market, as described above, that it had sufficient internal controls – in effect, that the market could trust what LendingClub was telling them.  What the market, and Valinor, did not know was that LendingClub was taking credit risk – but was doing so through an undisclosed related party called Cirrix.

146.    The Registration Statement represented that LendingClub did not assume credit risk or use the Company's own capital to invest in loans facilitated by its marketplace, stating:

> We do not assume credit risk or use our own capital to invest in loans facilitated by our marketplace, except in limited circumstances and in amounts that are not material. The capital to invest in the loans enabled through our marketplace comes directly from a wide range of investors, including retail investors, high-net-worth individuals and family offices, banks and finance companies, insurance companies, hedge funds, foundations, pension plans and university endowments, and through a variety of channels, such as borrower payment dependent investment securities and whole loan purchases.

147.    This representation about LendingClub not participating in its marketplace made the Registration Statement's representations about LendingClub's whole loan sales and growth all the more impressive:  Q3 2014 "whole loan sales accounted for $367 million"; and its steady loan-origination growth in 2014 had reached 47% by the end of the third quarter. These results, according to LendingClub, were the result of LendingClub's purely middleman position – it was not participating in its own markets.

148.    Similar representations were made during the time Plaintiffs purchased Lending Club securities.  LendingClub made misrepresentations to the market that the Company did not assume credit risk – representations that were rendered false or at a minimum materially misleading by LendingClub's failure to disclose Cirrix.

149.    The 2014 Form 10-K assured investors that the Company did not assume credit risk. It stated, in part:

> We do not assume credit risk or use our own capital to invest in loans facilitated by our marketplace, except in limited circumstances and in amounts that are not material. The capital to invest in the loans facilitated through our marketplace comes directly from a wide range of investors, including retail investors, high-net-worth individuals and family offices, banks and finance companies, insurance companies, hedge funds, foundations, pension plans and university endowments, and through a variety of channels, such as borrower payment dependent investment securities and whole loan purchases.

150.    LendingClub emphasized that a key feature of its business model was that the Company did not assume credit risk or use its own capital.  Likewise, LendingClub portrayed itself as disciplined in its growth, and attributed that discipline to its internal controls, as well as balanced supply and demand.

151.    The undisclosed relationship and transactions with Cirrix, including LendingClub's increasing reliance on Cirrix, rendered the Registration Statement and subsequent statements materially false and misleading with respect to LendingClub's loan originations, growth in loan originations, and assumption of credit risk.

152.    The Company's Q1 2015 Form 10-Q stated:

> We do not assume credit risk or use our own capital to invest in loans facilitated by our marketplace, except in limited circumstances and in amounts that are not material. The capital to invest in the loans enabled through our marketplace comes directly from investors.

153.    On March 10, 2015, Laplanche stated in an interview: "We continue to be very deliberate about our growth. Over the last three or four years we have been in this great position where we have not been either supply or demand constrained." Renaud Laplanche, Interview with Simon Cunningham of LendingMemo, March 10, 2015.

154.    On May 5, 2015, during the Q1 2015 LendingClub Earnings Call, LendingClub management, in particular defendant Laplanche, emphasized that a key feature of its business model was that the Company did not assume credit risk or use its own capital.  In the prepared remarks to investors, Laplanche stated:  "A key differentiator for our marketplace model is that, as a matter of business model, we do not assume credit risk or use our own balance sheet to invest in loans, and the loan sales and securities issued to investors perfectly match the term of the loans."

155.    On May 20, 2015, at the JPMorgan Global Technology, Media and Telecom Conference, Laplanche stated that LendingClub did not take credit risks directly.

156.    On June 23, 2015, on a podcast hosted by Barefoot Innovation Group, Laplanche stated that LendingClub sat in "the middle" between borrowers and lenders, with the lenders assuming the "credit risk".  This podcast was publicly disseminated on or about that date.

157.    The Q2 2015 Form 10-Q represented that LendingClub did "not assume credit risk" or use its "own capital to invest in loans".  The Q3 2015 Form 10-Q made the same representations regarding the Company not assuming credit risk as those set forth above.

158.    On August 4, 2015, during the Q2 2015 LendingClub Earnings Call, LendingClub management, in particular defendant Laplanche, emphasized that a key feature of its business model was that the Company did not assume credit risk or use its own capital.  In the prepared remarks to investors, Laplanche stated: "As a matter of business model, Lending Club does not assume credit risk."

159.    On September 30, 2015, the Company publicly released its response to the U.S. Treasury Department's Request for Information (RFI) on Expanding Access to Credit through Online Marketplace Lending.

160.    The response made the following representation regarding the Company's assumption of credit risk:

The Risks of Risk Retention

We believe there already is sufficient alignment of interest between credit marketplaces and investors and further alignment would be unnecessary. In fact, we believe that further alignment with investors could be counterproductive and contrary to borrowers' interest and the availability of affordable credit.

As the operator of a two-sided marketplace, Lending Club should remain neutral with respect to both sides of its marketplace (investors and borrowers).

Requiring Lending Club to hold loans or pieces of loans on its balance sheet could cause Lending Club's interests to be inappropriately aligned with the investors' interests, to the detriment of borrowers. As an example, platform rates are set based on expectations of future loan performance and the balance of supply and demand on the platform. As investors showed strong appetite for the loans originated through our marketplace, we were able to lower interest rates to borrowers. Over the last three years, the risk premiums required by investors on Lending Club's platform have decreased by 270 basis points. If we invested our own capital and earned interest on a portion of the loans, our financial incentive would be to keep interest rates artificially high irrespective of what the balance of supply and demand would otherwise suggest. This situation would result in making credit more costly for consumers and small business owners. (Footnote omitted.).

161.    The Q3 2015 Form 10-Q represented that LendingClub did "not assume credit risk" or use its "own capital to invest in loans".

162.    On October 29, 2015, during the Q3 2015 LendingClub Earnings Call, LendingClub management, in particular defendant Laplanche, emphasized that a key feature of its business model was that the Company did not assume credit risk or use its own capital.  In the prepared remarks to investors, Laplanche stated: "we do not assume credit risk or use our own balance sheet to invest in loans."

163.    The 2015 Form 10-K stated

Our business model is not dependent on using our balance sheet and assuming credit risk for loans facilitated by our marketplace. In order to support contractual obligations (Pool B loans), regulatory commitments (direct mail), the testing of pilot loan programs, or customer accommodations, we may use our capital on the platform from time to time on terms that are substantially similar to other investors.

164.    On February 11, 2016, during the Q4 2015 LendingClub Earnings Call, LendingClub management, in particular defendant Laplanche, emphasized that a key feature of

its business model was that the Company did not assume credit risk or use its own capital.  In the prepared remarks to investors, Laplanche stated: "we do not assume credit risk."

165.    In presentation materials accompanying prepared remarks, LendingClub represented that, as part of its efficient regulatory framework, it had "No Capital at Risk".

166.    Contrary to the above representations, LendingClub was taking credit risk through an undisclosed related party entity, Cirrix.

**What LendingClub Said About *Loan Originations* (And Didn't Say About Cirrix)**

167.    As LendingClub presented itself to the market (and Valinor) as a middleman, its loan origination numbers were critical.  Those numbers, if they were accurate and not misleading, told investors that LendingClub as a platform was providing entirely for loan origination between disconnected borrowers and lenders, sitting in between and taking a fee.

168.    But LendingClub itself was participating in the market.  The loan origination figures that LendingClub trumpeted were not the result purely of disconnected borrowers and lenders coming together on the LendingClub platform, but instead also included the participation of a related party to LendingClub – a related party that was unlike other lenders because LendingClub was backstopping the loans it purchased and was further unlike other lenders in that it, Cirrix, was owned in part by LendingClub executives.

169.    Failing to disclose Cirrix, and the fact that Cirrix was participating in the LendingClub marketplace, rendered LendingClub's statements as to loan originations false or misleading.  In none of the statements below did LendingClub reveal that a related party, partially owned by LendingClub executives, and party to a credit support arrangement with LendingClub, was on one side of a substantial number of transactions.

170.    On February 24, 2015, the Company issued a release announcing LendingClub's financial results for the fourth quarter and full year 2014. The release reported "[l]oan originations in the fourth quarter of 2014 were $1,415 million." The release also noted the Company's "strategy of fast yet disciplined growth," as well as its intention of "growing originations and revenue at a fast, yet deliberate pace." Furthermore, for the fourth quarter of

2014, the release reported operating revenue of $69.6 million, adjusted EBITDA of $7.9 million, and a loss per share of $0.07.

171.    On February 27, 2015, LendingClub filed its Annual Report on Form 10-K with the SEC announcing the Company's financial and operating results for the quarter and year ended December 31, 2014 (the "2014 Form 10-K"). The 2014 Form 10-K reported that in the fourth quarter of 2014, LendingClub's "marketplace facilitated over $1.4 billion of loan originations, of which approximately $0.2 billion were invested in through notes, $0.4 billion were invested in through certificates and $0.8 billion were invested in through whole loan sales."

172.    On May 5, 2015, the Company issued a release announcing its financial results for the first quarter of 2015. The release reported that "[l]oan originations in the first quarter of 2015 were $1,635 million, compared to $791 million in the same period last year, an increase of 107% year-over-year." Furthermore, for the first quarter of 2015, the release reported a loss per share of $0.02.

173.    Also on May 5, 2015, the Company hosted an earnings conference call with investors and analysts to discuss its first quarter 2015 financial results. Defendant Laplanche discussed the Company's success in originating new loans using a growth strategy that was predicated on "solid risk management," stating:

> While we have continued to more than double originations and revenue year-over-year, we have been disciplined about growing only as fast as we believe is responsible and compatible with solid risk management and a great user experience that contribute to building and maintaining our brand and our reputation.

174.    The Q1 2015 Form 10-Q reported that in the first quarter of 2015, "our marketplace facilitated $1.6 billion of loan originations, of which approximately $0.3 billion were invested in through notes, $0.5 billion were invested in through certificates and $0.8 billion were invested in through whole loan sales."

175.    The Q1 2015 Form 10-Q also stated:

We believe originations are a key indicator of the adoption rate of our marketplace, growth of our brand, scale of our business, strength of our network effect, economic competitiveness of our products and future growth. Loan originations have increased significantly over time due to the increased awareness of our brand, our high borrower and investor satisfaction rates, the effectiveness of our borrower acquisition channels, a strong track record of loan performance and the expansion of our capital sources.

176.    On August 4, 2015, the Company issued a release announcing its financial results for the second quarter of 2015. The release reported that the Company had "another very strong quarter" and that "[l]oan originations in the second quarter of 2015 were $1.91 billion, compared to $1.01 billion in the same period last year, an increase of 90% year-over-year." Furthermore, for the second quarter of 2015, the release reported operating revenue of $96.1 million, adjusted EBITDA of $13.4 million, and a loss per share of $0.03. On August 5, 2015, LendingClub filed its Report on Form 10-Q with the SEC announcing results for the quarter ended June 30, 2015 (the "Q2 2015 Form 10-Q"), stating, "our marketplace facilitated $1.9 billion of loan originations, of which approximately $0.3 billion were invested in through notes, $0.6 billion were invested in through certificates and $1.0 billion were invested in through whole loan sales."

177.    During the October 29, 2015 earnings call, Laplanche made the following statement regarding the diversity and "very broad appetite" of the Company's investor base and its ability to "manage the flow of both supply and demand":

We think, again, that's a great benefit of the model now. That benefit will get even stronger in some different economic environments, especially as we go into the next cycle and we will show the resiliency [of] the very diverse investor database we've built very patiently over the last eight years. I think we've ha[d] a big competitive advantage over some of the newer platforms that, for the most part, have no retail investors and considerable concentration in investor base or strong reliance on the securitization markets, which really isn't our case at all.

178.    At the time Laplanche was boasting about the "very diverse investor database" LendingClub had built over the past eight years, his and LendingClub's years' long use of Cirrix had reached hundreds of millions of dollars of related-party purchases of LendingClub loans.

179.    LendingClub's Q3 2015 Form 10-Q reported that in the third quarter of 2015, "our marketplace facilitated $2.2 billion of loan originations, of which approximately $0.3 billion were invested in through notes, $0.7 billion were invested in through certificates and $1.2 billion were invested in through whole loan sales."

180.    On December 2, 2015, Laplanche addressed investors at the Credit Suisse Technology, Media & Telecom Conference. When asked where LendingClub's "next leg of growth" is going to come from, he responded, in part:

> We are really not in a situation where some of the specialty finance companies or banks, even where in the mortgage crisis, pre-mortgage crisis, where they decide on how much risk they are taking, but then eventually they sort of sell that off to investors.

> We have an immediate check with investors, a lot of transparency as to what the quality is, a lot of disclosures.

181.    On December 9, 2015, Laplanche was fielding questions at the Goldman Sachs US Financial Services Conference, when the following exchange took place:

> Unidentified Participant: I'm just curious, with coming out of the crisis, with regulators more insisting [sic] on underwriters keeping some amount of interest in their loans to make sure that they behave properly – I'm just curious, how do you have the confidence to think that you're not going to have to go to that model over a period of time? And/or, even if you don't have to go to that model, do you worry about liability issues in the first really tough credit cycle, in terms of things coming back to bite you?

> Renaud Laplanche:

> Yes. So, I think there were questions when we got started about – I mean, mostly from investors, feeling, okay, why as an investor should I have the confidence to invest in the platform, if you, the operator of the platform, are not eating your own dog food, in a way.

> Our situation is almost the opposite of what you've seen in the mortgage space in 2008, where it was a very diffused and long chain of intermediaries touching the loans, and the brokers were different from the originators, from the rating agencies, from the investors, from the servicers.

> In our case, we acquire the borrowers, originate the loan, price them, and service them. If the loan doesn't perform, it's us. We have nobody else to point fingers to. And that builds a tremendous amount of accountability.

> And when you add on top of that the transparency we're providing in the (inaudible) population, and every investor can check the exact makeup of the

population, and the transparency we provide in performance, including first payment default, and 3-month and 6-month on book delinquencies, there's a very tight feedback loop with our investor base, and they are watching very carefully the quality of the origination and the quality of the servicing.

I think, even if we wanted to, there would be no way for us to degrade either underwriting or servicing without the investors being aware and reacting to it.

182.    On February 11, 2016, the Company issued a release announcing its financial results for the fourth quarter and full year 2015. The release reported that "[l]oan originations in the fourth quarter of 2015 were $2.58 billion, compared to $1.41 billion in the same period last year, an increase of 82% year-over-year." Furthermore, for the fourth quarter of 2015, the release reported operating revenue of $134.5 million, adjusted EBITDA of $24.6 million, and EPS of $0.01.

183.    Also on February 11, 2016, the Company hosted a conference call with investors and analysts to discuss its fourth quarter and full year 2015 financial results. When asked by an analyst whether LendingClub "may be open to securitizing its own loans for the first time" and, if so "what sort of balance sheet risk would that expose" the Company to, Laplanche responded:

We are very attached to the marketplace model. We think it's a superior model than any other models. We have no intentions as a matter of business model, to start investing our own balance sheet and take balance sheet risks in our loans. As we said in the past, we can always use our balance sheet on a temporary basis for test programs, but this would always be [] very small. Again, no change in the business model. What's going to continue to happen, is some of our investors on the platform can turn around and refinance themselves on the securitization [lockout] and we want to support them and do what's right for them.

184.    On February 22, 2016, LendingClub filed its 2015 Form 10-K. The Company's 2015 Form 10-K reported that "[i]n 2015, our marketplace facilitated over $8.4 billion of loan originations, of which approximately $1.3 billion were invested in through notes, $2.6 billion were invested in through certificates and $4.5 billion were invested in through whole loan sales."

185.    LendingClub    and    Laplanche's    statements    to    the    market    regarding LendingClub's loan originations were materially misleading as they failed to disclose the

relationship and transactions with Cirrix, a related party entity that was purchasing LendingClub loans while receiving credit support from LendingClub and which was partially, and significantly, owned by LendingClub executives.

186.    As Judge William Alsup of the Northern District of California has observed in an opinion regarding a class action lawsuit filed against LendingClub: "investors would also have been interested to know that millions of dollars of loans were not the result of organic matches in the marketplace reflecting participants' trust in LendingClub's purportedly neutral platform, but were inflated artificially through self-dealing disguised as real transactions."

187.    The undisclosed relationship and transactions with Cirrix, including LendingClub's increasing reliance on Cirrix to purchase loans on the platform, rendered the Registration Statement and subsequent statements materially false and misleading with respect to LendingClub's loan originations, growth in loan originations, and assumption of credit risk.

### The Reality of Cirrix

188.    One of the material weaknesses to which LendingClub has admitted was the inadequacy of its internal controls with respect to the disclosure of related-party transactions.

189.    This inadequacy both concealed an increased risk of self-dealing, and enabled a self-dealing transaction with respect to at least one family of funds:  Cirrix.

190.    Cirrix was formed in 2012, years before LendingClub's IPO, for the sole purpose of purchasing loans from LendingClub, with which it had a working partnership. One news report described the relationship as:

> Cirrix buys loans that LendingClub sells. To boost its returns, Cirrix borrows from other banks to buy some of these loans. This creates a virtuous cycle for Lending Club:  the more money Cirrix borrows, the more loans it can buy, and the more fees LendingClub collects.

191.    John Mack, a member of LendingClub's board of directors, was heavily involved with Cirrix, and his financial stake in Cirrix, together with Laplanche and LendingClub, reached over 30%.

192.    As part of this partnership, Cirrix had access to LendingClub's Board and received inside information regarding LendingClub's credit performance and underwriting.

193.    Cirrix's working partnership with LendingClub led to Silicon Valley Bank agreeing to lend Cirrix approximately three times the amount of capital it raised from investors. This enabled Cirrix to leverage its capital such that each $1 million capital investment in Cirrix allowed Cirrix to turn around and purchase approximately $4 million worth of LendingClub loans.

194.    This force multiplier was good for Cirrix, and enabled LendingClub to pursue its loan origination scheme.  When Cirrix invested in LendingClub loans, for every $1 invested in Cirrix by, for example, Laplanche, Cirrix could plow $4 into LendingClub loans, thereby increasing the amount of loan activity on LendingClub's platform, and misleading investors like Valinor into believing LendingClub was generating that activity on its own.

195.    Because of LendingClub's working partnership with, and/or Laplanche's and Mack's investments in Cirrix, Cirrix was the only LendingClub loan investor that had access to all of the Company's loan programs, including private, public and small business loans.

196.    Laplanche and Mack also personally benefitted from their Cirrix investments.

197.    By the time of the IPO, LendingClub loans represented 100% of Cirrix's assets, and Cirrix's loan purchases drove LendingClub's pre-IPO results, representing *20%* of LendingClub's critical loan-origination growth and nearly *5%* of LendingClub's total sales of whole loans in the last quarter before the IPO.

198.    LendingClub has admitted that Laplanche and Mack owned 12% of Cirrix by the end of 2015, but has not revealed the date when their formal ownership stake first began. These interests were not disclosed to investors and investors did not learn of these interests until LendingClub's revelations in May 2016.

199.    At least one news report indicates that the executives' ownership stake predated the IPO (and thus would have existed during the pre-IPO period).

200.   LendingClub, Laplanche, and Mack ultimately owned a combined 31% of Cirrix that they had not disclosed to investors.

201.   As such, LendingClub had significant influence over Cirrix and vice versa. Although Cirrix was a related party, LendingClub's Registration Statement did not disclose this relationship or its transactions with Cirrix.

202.   None of LendingClub's subsequent 10-Q or 10-K filings disclosed the existence of Cirrix, or its entanglement with LendingClub, Laplanche, and Mack, before May of 2016.

203.   From inception, LendingClub also provided Cirrix with a credit-support agreement under which LendingClub assumed millions of dollars of risk for the loans it sold to Cirrix (and itself).  This was a clear use of LendingClub's balance sheet to invest in loans on the platform.

204.   Neither LendingClub's registration statement nor any of LendingClub's subsequent 10-Q or 10-K filings disclosed the existence of the credit support agreement with Cirrix before May of 2016.

205.   Concealing the Cirrix relationship and the credit-support agreement left LendingClub with, in effect, an off balance sheet vehicle that was acquiring loans – and thus taking credit risk –which LendingClub was obligated by the credit support agreement to backstop.

206.   The credit-support agreement completed the link for Cirrix to boost LendingClub's results.  LendingClub, and its executives, now owned a significant stake in an entity that could make levered investments in LendingClub loans, and was incentivized to do so because losses from those loans were backstopped by LendingClub itself via the credit-support agreement.

207.   While LendingClub represented to the market it was not participating in its own marketplace or taking any credit risk, thereby acting as a pure middleman, the concealed interest in Cirrix along with the credit support arrangement made these representations false. LendingClub was taking credit risk and was participating in its own loan marketplace because

Cirrix was participating in the marketplace, LendingClub was related to Cirrix, and LendingClub was exposed to Cirrix risk as a result of the credit support agreement.

208.    Regulation S-K Item 303 (17 C.F.R. §229.303) requires disclosure of, among other things, (1) related-party transactions; and (2) trends that can be reasonably expected to have a material impact on financial results. Under Accounting Standards Codification 850, which defines relationships that trigger related-party disclosure obligations, a related party may exist when "[o]ther parties that can significantly influence the management or operating policies of the transacting parties or that have an ownership interest in one of the transacting parties and can significantly influence the other to an extent that one or more of the transacting parties might be prevented from fully pursuing its own separate interests." ASC 850-10-20. LendingClub had a duty to disclose its relationship and transactions with Cirrix.

209.    Cirrix was significant to LendingClub's business.

210.    Cirrix would purchase hundreds of millions of dollars of loans from LendingClub during the relevant period.  During 2015 alone, Cirrix purchased $139.6 million of whole loans and $34.9 million of interests in whole loans from LendingClub.  This represented almost 5% of LendingClub's loan origination growth in fiscal year 2015.

211.    Under the credit support agreement, at the end of the 2015 fiscal year, LendingClub was exposed to nearly $35 million of potential losses related to the hundreds of millions of dollars in loans Cirrix had purchased, this exposure represented more than 5% of *net revenue*, and almost *half* of LendingClub's EBITDA for 2015.

212.    Investors did not know that Cirrix was a related party of LendingClub, nor that a related party who LendingClub was backstopping with a credit support agreement was pumping up LendingClub's results.

213.    Due to its declining returns, however, by early 2016, Cirrix required an additional capital infusion in order to continue purchasing LendingClub loans. Laplanche and Mack infused Cirrix with cash, as Laplanche had secretly entered into arrangements whereby he could raise cash by using his LendingClub shares as collateral.  Mack also provided Cirrix

with an infusion so it could continue to purchase more LendingClub loans and avoid a total collapse in LendingClub's marketplace. Then, without disclosing their personal interests, Laplanche and Mack caused LendingClub's Board to approve a $10 million direct investment in Cirrix, so LendingClub could purchase more of its own loans.

214.   As of the close of business on April 1, 2016, the Company, Laplanche, and Mack owned approximately 15%, 8%, and 8% of limited partnership interests in Cirrix, respectively, for an aggregate interest of approximately 31%. At the same time, whole loans and interests in loans facilitated by LendingClub's platform comprised 100% of Cirrix's assets.

215.   This additional capital enabled LendingClub to continue using Cirrix to increase LendingClub's reported loan originations, revenues, and earnings per share ("EPS"). In fiscal 2015, LendingClub's fees from loans purchased by Cirrix amounted to 5% of its reported growth in servicing fees, and enabled LendingClub to double its EPS growth rate and slash its EPS losses by 50%.

216.   Likewise, in Q1 2016, Cirrix purchased $114.5 million in LendingClub whole loans, which was equal to 6% of LendingClub's whole loan originations. That same quarter, Cirrix's loan purchases amounted to 67% of LendingClub's loan-origination growth.

217.   LendingClub's statements regarding its not taking credit risk, and its statements regarding its financials were false or misleading when made as LendingClub and Laplanche knew or recklessly disregarded that LendingClub's reported loan originations, loan originations growth, revenues/fees, and EPS all included undisclosed related-party transactions with Cirrix; and LendingClub and Laplanche knew or recklessly disregarded that contrary to its stated business model, LendingClub assumed material credit and liquidity risks, including tens of millions of dollars in a credit-support agreement with Cirrix.

218.   LendingClub's failure to reveal its Cirrix relationship to investors, to acknowledge Cirrix as a related entity, and to reveal its credit support relationship with Cirrix rendered LendingClub's statements as to taking credit risk, as to loan originations, as to the source of its growth (and whether that growth was organic and driven by its brand) along with

its statements that it had sufficient internal controls (as described above) false and misleading when made.

## V.   LendingClub Reveals the Truth – and the Market Reacts

219.   In a period of a week, the market learned that LendingClub had deficient internal controls; learned of the existence of a related entity (Cirrix) that was involved in LendingClub loans; learned of a credit-support agreement with that entity; that that entity was partially owned and controlled by LendingClub executives or directors (Mack and Laplanche); that LendingClub executives had been able to manipulate loan data; had misrepresented or lied to a counterparty and sold that counterparty (Jefferies) nonconforming loans; and that they could not trust LendingClub's financials, that LendingClub had been taking on credit risk, and that its loan originations were not the result of organic growth.   The market price for LendingClub common stock collapsed.

220.   On May 9, 2016, pre-market, LendingClub shocked investors when it disclosed in an SEC filing that its Board had accepted the resignation of its Chairman, CEO and founder, Laplanche. The Company reported that Laplanche had resigned after the Board learned, among other things, that LendingClub had intentionally falsified data on millions of dollars in loans, and that three senior managers had been involved in a $22 million sale of loans to an investor (later identified as the Jefferies Group), where the quality of loans LendingClub had provided was "in contravention of the investor's express instructions" regarding loan quality (it was later revealed that Laplanche had not been candid during an inquiry into this fraudulent activity).

221.   In the same SEC filing, the Company also disclosed another problem:  that one executive and one Board member (later revealed as Laplanche and Mack, respectively) had concealed their personal interests in a fund (later identified as Cirrix) that Laplanche had convinced LendingClub to invest in.

222.   LendingClub further identified that it had a material weakness in its internal controls over financial reporting and would seek to "restore" the effectiveness of "its disclosure controls and procedures."

223.    Guggenheim Securities, LLC issued a report that downgraded LendingClub, noting that "LC may lack a culture of compliance," and noting that "the disclosure of the series of control failures underscores [LendingClub's] need to improve its oversight and compliance related to internal control issues."

224.    After market on May 9, 2016, news reports stated that LendingClub was subject to an SEC probe connected to Laplanche and "irregularities" LendingClub detected during an internal review.

225.    During market hours on May 10, 2016, news reports stated that Jefferies was pausing its purchases of LendingClub loans, because of the issues disclosed the previous day. Also on May 10, during market hours, news reports came out stating that LendingClub personnel had changed loan dates in order to assist with selling the loans to Jefferies.  Further news reports, including an article by the New York Times citing persons familiar with the matter, stated that dates had been changed on over $3 million worth of loans, and that the review connected to that issue also turned up Laplanche's ownership in a related entity (Cirrix).

226.    The news on May 9, 2016 dealt a blow to LendingClub stock, causing its share price to fall nearly 35%, to close at $4.62. With further news after-market hours on the 9th and during market hours on the 10th, LendingClub's stock price continued to fall the next day, May 10th, closing at $4.10 per share. The S&P 500 rose both days.

227.    The decrease in LendingClub's stock price on May 9th and 10th 2016 were each statistically significant at the 95% confidence level.

228.    Media reports directly connected the fall in stock price to LendingClub's admissions.

229.    Analysts reacted to the admissions as well, reducing price targets on LendingClub common stock.

230.    The information disclosed to the market on May 9th and 10th also materialized the concealed risk of LendingClub's deficient internal controls.

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS AND THE COMMON LAW

231.    On May 11, 2016, after market hours, news reports disclosed that investments by LendingClub and Laplanche into Cirrix were done in part "to boost demand for the company's loans at a time of market stress."  Laplanche had urged investment, according to the newly disclosed news reports, in order for Cirrix to buy more LendingClub loans at a time when Cirrix has been "suffering some of its worst performance in years."

232.    On May 12, 2016, LendingClub stock fell from $4.08 per share to $3.76 per share, a decline of $0.32.

233.    The decrease in LendingClub common stock price on May 12th was statistically significant at the 95% confidence level.

234.    The information disclosed to the market on May 11th (after market hours), impacting LendingClub's stock price on May 12th, also materialized the concealed risk of LendingClub's deficient internal controls.

235.    The partial disclosures on these dates negatively affected LendingClub's stock price and harmed Plaintiffs.

## POST RELEVANT PERIOD ALLEGATIONS

236.    On May 16, 2016, after market hours, LendingClub filed a Quarterly Report on Form 10-Q with the SEC (the "Q1 2016 Form 10-Q") revealing that it had received a grand jury subpoena and confirming that it was under investigation by the U.S. Department of Justice ("DOJ").

237.    LendingClub also confirmed that it had identified material weaknesses in its internal controls over financial reporting and a "[l]ack of transparent communication and appropriate oversight" of dealings with investors and, as a result, LendingClub was contemplating a dramatic shift in its business model.

238.    A material weakness, as defined in PCAOB Auditing Standard No. 5 ("AS 5"), is a "deficiency, or a combination of deficiencies, in internal control over financial reporting,

such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis." AS 5.A7.

239.   Specifically, addressing its internal controls, which were the same deficient controls existing at the time of the IPO, LendingClub admitted that:

> the identified material weakness is the result of the aggregation of control deficiencies related to the Company's "tone at the top," which manifested in three primary areas described further below [sales of near-prime loans to Jefferies; review of related party transactions; and lack of transparent communication and oversight regarding loan amendments]. In addition, the Company has concluded that the material weakness identified as of March 31, 2016 also existed at the end of 2015 and therefore that its disclosure controls and procedures were ineffective and not operating at the reasonable assurance level as of December 31, 2015.

> The control environment, which includes the Company's Code of Conduct and Ethics Policy, is the responsibility of senior management, and sets the tone of our organization, influences the control consciousness of employees, and is the foundation for the other components of internal control over financial reporting.

240.   The Q1 2016 Form 10-Q also disclosed that LendingClub may have to take loans onto its balance sheet because of repurchase obligations, and that its May 9, 2016 disclosures had eroded lender confidence to the point that LendingClub would have to offer inducements and/or use an even "greater amount of its own capital to purchase loans on its own platform."   This materialized the risk of LendingClub's deficient internal controls – because LendingClub executives had been able to manipulate loan data and misrepresent loan information to a counterparty, now other lender-counterparties would not deal with LendingClub.  LendingClub, which had been misrepresenting that it was not taking credit risk (which, as discussed above, was false), would now have to take on ever more credit risk because lenders could not trust its internal controls.

241.   In its Q1 2016 Form 10-Q, LendingClub also revealed that it "is subject to a credit support agreement that requires it to pledge and restrict cash in support of its contingent obligation to reimburse the Investment Fund for net credit losses on loans underlying the interests in whole loans that are in excess of a specified, aggregate net loss threshold.  The Related Party Investors and the Company are excluded from receiving any benefits, if

provided, from this credit support agreement." This was a reference to the credit support agreement with Cirrix.

242.    In the same 10-Q, LendingClub admitted that it would have to participate in its own marketplace to avoid collapse, stating "these actions likely may have material adverse impacts on the Company's business, financial condition (including its liquidity), results of operations and ability to sustain and grow loan volume."

243.    On May 16, 2016, The Wall Street Journal published an article entitled "LendingClub Discloses Justice Probe, Potential Shift in Business Model." LendingClub reportedly received a criminal grand jury subpoena from the DOJ on May 9, 2016, i.e., the same day it announced Laplanche's forced resignation. The Wall Street Journal also reported that LendingClub had been contacted by the SEC.

244.    On May 18, 2016, The Wall Street Journal published an article entitled "New York's Financial Regulator Subpoenas LendingClub," reporting that New York's Department of Financial Services had launched an inquiry into the business practices of LendingClub going back to 2013.

245.    According to a May 25, 2016 Macquarie Research report, "LendingClub ('LC') has had a tumultuous few weeks, and investor confusion surrounding the shock resignation of its co-founder, Chairman, and CEO Renaud Laplanche due to improper loan sales and personal investment disclosures remains an overhang. These events raise questions around LC's internal controls, its culture, and the resiliency of marketplace lending models in general."

246.    LendingClub has also revealed that the Company took, and needed to continue to take, "remediation steps to resolve the material weaknesses in internal control over financial reporting identified in the first quarter of 2016," including the termination or resignation of three other senior managers. The three senior managers (who were fired or resigned) reportedly involved in loan sales at the Company, were (a) Jeff Bogan, who had worked at the Company since April 2012 and was the Company's Head of Investor Group; (b) Adelina Grozdanova, who had worked at the Company since July 2013 and was Vice President, Head of Institutional

Investors; and (c) Matt Wierman, who left as a Senior Vice President and no later than 2013 was in charge of Product Performance at the Company. Bogan and Grozdanova had both come from Morgan Stanley and had helped prepare LendingClub for its IPO.

247.    On June 28, 2016, LendingClub announced that the review by the Board sub-committee previously disclosed in the Q1 2016 Form 10-Q identified yet more items that necessitated additional review. First, the Company announced that adjustments that had been made to the valuation of six private investment funds (the "Funds") managed by LCA were not consistent with GAAP. As a result of the additional review, the Company announced that it would take certain remedial measures.

248.    LendingClub itself stated in its Form 10-Q for the Second Quarter of 2016, (the "Q2 2016 Form 10-Q") filed June 28, 2016, that "As a result of recent events, our stock price has declined significantly…"

249.    In the Q2 2016 Form 10-Q, LendingClub stated that "our business could be materially and adversely harmed as a result of the announcement of the results of our internal review and the resignation of our Chief Executive Officer (CEO)."

250.    In the same 10-Q, LendingClub stated that the announcement of the internal board review on May 9, 2016 resulted, in part, in "many investors" pausing or reducing their investment activity in LendingClub.

251.    In the same 10-Q, LendingClub stated that unfavorable media coverage "related to the results of our review and resignation of our former CEO . . . has resulted in investors pausing their investments through the platform and may result in, a slowdown in investor demand on our platform. If this negatively [sic] publicity were to persist, it could further harm our reputation, and materially and adversely affect our business in the future."

252.    In the same 10-Q, LendingClub stated that "As a result of the circumstances relating to our internal board review into certain private loan sales to a single institutional investor in contravention of its requirements and other matters, and the resignation of our former CEO, a number of investors that account for, in the aggregate, a significant amount of

investment capital on the platform, have paused their investments in loans through the platform."

253.    In a blog post in or around the same time, Patrick Dunne of LendingClub admitted that "following [LendingClub's] announcements in May we experienced a sudden and significant decrease in investor demand…"

254.    The partial disclosures of information on May 9th, 10th, and 11th, removed inflation caused by Defendants' prior misrepresentations and omissions from LendingClub stock, and also materialized the concealed risk of LendingClub's deficient internal controls, resulting in the decline in share price.

## ADDITIONAL SCIENTER ALLEGATIONS

255.    In addition to his conscious decision to deceive the Board regarding his ownership interest in a company doing business with LendingClub and, along with other senior managers manipulating data in live databases to make loan packages appear to comply with lender guidelines, Laplanche further exploited LendingClub's lack of internal controls to engage in other deceptive practices. For example, Laplanche concealed from the Board his manipulation of reported loan volume prior to the IPO, when he took out 32 loans for himself and family members in order to misleadingly increase LendingClub's reported platform volume by nearly 10%. Loan volumes are a key metric for potential investors to gauge the potential of LendingClub's marketplace.

256.    The Company has admitted these loans were inappropriate and were made in order to "help increase reported platform loan volume," confirming that Laplanche had corrupted LendingClub's operations since inception.

257.    The SEC is further investigating Laplanche's role in LendingClub's buyback plan, scrutinizing whether Laplanche advocated for LendingClub to use its cash to prop up its shares without telling the Board about a possible conflict of interest. Laplanche failed to disclose to the Board prior to obtaining Board approval of the $150 million buyback in

February 2016 that he had pledged his shares as collateral for a loan and was required to put up more money if the price of LendingClub stock declined below a certain level.

258.     Laplanche had formulated and induced the Board to approve a $150 million common stock buyback program in order to prop up the trading price of LendingClub stock and thereby avoid the investor scrutiny that would result therefrom.

259.     LendingClub also admitted that there were "material weaknesses" in the Company's internal controls over its financial reporting. The Company admitted that these material weaknesses existed in 2015 and were the result of the aggregation of control deficiencies related to LendingClub's "tone at the top," a term explained in the Committee of Sponsoring Organizations Framework for Internal Controls ("COSO Framework") that implicates the top-level of an organization's management, including the CEO and CFO – the roles Laplanche and Dolan occupied at LendingClub. Moreover, the SOX Certifications Laplanche and Dolan executed throughout the relevant period stated there had been "no change" in controls during the interim periods.

260.     In its Q1 2016 Form 10-Q, LendingClub admitted that, as of March 31, 2016, the Company's internal control over financial reporting was ineffective. The Company also admitted that its internal control over financial reporting was ineffective as of December 31, 2015, and likewise filed statements that there had been "no change" of those controls during the relevant period. Thus, Laplanche and Dolan were aware or deliberately reckless in disregarding that the SOX Certifications they signed during the relevant period, which attested to the accuracy and completeness of the Company's financial statements and effective internal controls, were false.  Laplanche, in particular, knew or should have known that the SOX Certifications were false during the relevant time as he was personally involved in (or personally directed) much of the underlying misconduct.

261.     LendingClub admitted that, prior to December 31, 2015, it used LCA to purchase expiring LendingClub loans, even though doing so was outside the investment guidelines LCA had promised its investors. Laplanche, Dolan, and LendingClub's General

Counsel comprised LCA's Investment Policy Committee and were responsible for managing LCA's portfolio of loans and verifying conformity with its investment guidelines.

262.    On August 8, 2016, LendingClub announced that it had accepted Dolan's "voluntary resignation" as the Company's CFO and Principal Accounting Officer. The same day, based on an interview of Scott Sanborn, Bloomberg reported that Dolan had informed Sanborn earlier that year that she intended to make a move, but he asked her to postpone her plans to help weather the turmoil following Laplanche's exit. Between November 3, 2015 and December 14, 2015, and while Dolan was in possession of the material non-public information described above as having been withheld from investors, she sold 135,000 shares of LendingClub stock for proceeds of over $1.8 million.

263.    In an attempt at remediation of the above internal control weaknesses and failures, the Company has begun implementing various changes in internal control over financial reporting to remediate these weaknesses, including remedial efforts to prevent the alteration of information on live Company databases.

264.    The senior managers identified as having been involved in this conduct, including Laplanche, were terminated or forced to resign, by Q2 2016 and the Company hired an outside consulting firm to support data change management processes in order to prevent additional falsification of loan documentation. Laplanche was forced out, in part, because when confronted with his conduct by the Board, he "wasn't upfront" with directors about what he knew.

**RELIANCE**

265.    Plaintiffs, through Valinor, actually, read (or heard), reviewed, and relied upon Defendants' misrepresentations prior to purchasing LendingClub stock.

266.    Prior to purchasing LendingClub securities for Plaintiffs, one or more employees of Valinor actually read, reviewed and justifiably relied upon LendingClub's public disclosures, investor presentations and financial statements, including LendingClub's statements as to its internal controls.

267.    Multiple investment professionals with meaningful experience in financial analysis and the examination of SEC filings, including the examination of forms 10-Q and 10-K, who were employed by Valinor, in fact reviewed, read, and relied on LendingClub's public filings.  These investment professionals regularly reviewed LendingClub's SEC filings as part of their investment decision making process.

268.    In particular, one or more employees of Valinor actually read, reviewed and relied upon LendingClub's 2014 Registration Statement; 2014 10-K filed February 27, 2015; Q1 2015 10-Q filed May 5, 2015; Q2 2015 10-Q filed August 5, 2015; Q3 2015 10-Q filed November 3, 2015; and the 2015 10-K filed February 22, 2016.

269.    Employees of Valinor also listened to earnings calls.

270.    Employees of Valinor also reviewed press and media items about LendingClub.

271.    Prior to purchasing LendingClub pre-IPO securities for Plaintiffs, one or more employees of Valinor actually read, reviewed and relied upon LendingClub's pre-IPO public disclosures, including LendingClub's periodic pre-IPO filings with the SEC, and the Series B and Series D Agreements, including LendingClub's representations as to its internal controls.

272.    When purchasing LendingClub securities on behalf of Plaintiffs, Valinor actually read (or heard) and justifiably relied on each of the statements contained in public filings described above.

273.    If a statement has been identified as having been directly communicated to Valinor in a private, as opposed to a public communication, an employee of Valinor actually read or heard the private communication from LendingClub and relied on that private statement in purchasing securities of LendingClub for Plaintiffs.

274.    Had Valinor known the truth, it would not have purchased LendingClub securities on behalf of Plaintiffs or, if it had done so, would not have paid the price it did.

275.    As to post-IPO LendingClub common stock, Plaintiffs also invoke the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:  (a) Defendants made public misrepresentations or failed to disclose material facts

during the relevant time period; (b) the omissions and misrepresentations were material; (c) LendingClub post-IPO common stock traded in an efficient market; (d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of LendingClub post-IPO common stock; and (e) Plaintiffs purchased LendingClub post-IPO common stock between the time Defendants misrepresented or failed to disclose material facts and the time when the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

276.    The market for LendingClub post-IPO common stock was open, well-developed and efficient at all relevant times. As a result of the aforementioned materially false and misleading statements and failures to disclose, LendingClub post-IPO common stock traded at artificially inflated prices during the relevant period. The artificial inflation continued until the time the market came to realize the truth about LendingClub.

277.    At all relevant times, the market for LendingClub post-IPO common stock was efficient for the following reasons, among others:  (a) LendingClub filed periodic reports with the SEC; (b) the stock was listed and actively traded on the NYSE; (c) numerous analysts followed LendingClub; (d) the average weekly trading volume of LendingClub shares exceeded 2% of its total outstanding shares; (e) LendingClub was eligible to file an SEC S-3 Registration Statement and (f) LendingClub regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

278.    Plaintiffs purchased LendingClub post-IPO common stock in reliance on the market price of LendingClub post-IPO common stock, which reflected all the information in the market, including the misstatements by Defendants.

## LOSS CAUSATION

279.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs. During the time that Plaintiffs purchased

LendingClub securities, set forth in Exhibits 1 through 3, the market price of those securities was artificially inflated as a direct result of Defendants' materially false and misleading statements and omissions. As a series of partial but inadequate disclosures was issued, as detailed above, the price of those securities dropped, and Plaintiffs were damaged.

280.   The timing and magnitude of LendingClub's stock price declines, as well as the lack of any other plausible cause of the declines, negates any inference that the loss suffered by Plaintiffs was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to defendants' fraudulent conduct.

281.   The economic loss suffered by Plaintiffs was a direct result of Defendants' scheme and misrepresentations, which artificially inflated the price of LendingClub securities and the subsequent significant decline in the value of LendingClub stock as the true state of the Company's operations and internal controls leaked into the market, correcting the misrepresentations and/or the economic impact thereof.

282.   LendingClub common stock experienced negative abnormal returns on May 9th, 10th and 12th 2016.

283.   The negative abnormal returns LendingClub common stock exhibited on May 9th, 10th, and 12th 2016 are attributable to the release of corrective information to the marketplace.  The disclosure of corrective information to the marketplace caused the negative abnormal returns on those dates.

284.   No negative, economically significant, non-fraud related information was released to the marketplace on May 9th, 10th or 12th that would confound the fraud related information released on those days.

285.   In addition, the disclosures on May 9th, 10th and after-market hours on the 11th, materialized the concealed risk of LendingClub's deficient internal controls.

**NO SAFE HARBOR**

286.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this

Complaint. The specific statements pleaded herein were not "forward-looking statements" nor were they identified as "forward-looking statements" when made. Nor was it stated with respect to any of the statements forming the basis of this Complaint that actual results "could differ materially from those projected." To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of LendingClub who knew that those statements were false when made.

## FIRST CAUSE OF ACTION

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5

### Against All Defendants

### (Regarding All Statements After May 16, 2013; regarding LendingClub Pre-IPO Common Stock and Post-IPO Common Stock)

287.   Plaintiffs repeat each and every allegation contained in each of the foregoing paragraphs as if set forth herein.

288.   This Cause of Action is asserted against Defendants LendingClub, Laplanche and Dolan, for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

289.   Defendants LendingClub, Laplanche, and Dolan, both directly and indirectly used the means and instrumentalities of interstate commerce in the United States to make the materially false and misleading statements and omissions of material fact alleged herein to: (i) deceive the investing public, including Plaintiffs, as alleged herein; (ii) artificially inflate and maintain the market price (or value) of LendingClub common stock; and (iii) cause Plaintiffs

to purchase LendingClub common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, LendingClub, Laplanche, and Dolan took the actions set forth above.

290.    Defendants LendingClub, Laplanche, and Dolan both directly and indirectly: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of LendingClub common stock in an effort to artificially inflate and maintain the market prices (or value) for LendingClub common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

291.    By virtue of their high-level positions at the Company, Laplanche and Dolan were authorized to make public statements, and made public statements on LendingClub's behalf. These senior executives were privy to and participated in the creation, development, and issuance of the materially false and misleading statements alleged herein, and/or were aware of the Company's and their own dissemination of information to the investing public that they recklessly disregarded was materially false and misleading.

292.    In addition, LendingClub, Laplanche, and Dolan had a duty to disclose truthful information necessary to render their affirmative statements not materially misleading, including information with respect to LendingClub's internal controls, related parties, financial condition, and corporate operations, so that the market price (or value) of the Company's securities would be based on truthful, complete and accurate information.

293.    Defendants LendingClub, Laplanche, and Dolan acted with knowledge or reckless disregard for the truth of the misrepresented and omitted facts alleged herein, in that they failed to ascertain and disclose the facts, even though such facts were known or readily available to them. Defendants LendingClub's, Laplanche's, and Dolan's material misrepresentations and omissions were done knowingly and/or recklessly, and had the effect of concealing the truth with respect to LendingClub's operations, business, performance and

prospects from the investing public, including misstating the effectiveness of the Company's internal controls and the accuracy of LendingClub's financial statements.  By concealing these material facts from investors, LendingClub, Laplanche, and Dolan supported the artificially inflated price of LendingClub's securities.

294.    The dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, artificially inflated the market price (or value) of LendingClub's securities. In ignorance of the fact that the market prices (or value) were artificially inflated, and relying directly or indirectly upon the materially false and misleading statements made by LendingClub, and upon the integrity of the market in which the Company's securities trade, or upon the absence of material adverse information that was recklessly disregarded by LendingClub, Laplanche, and Dolan, but not disclosed in public statements by LendingClub, Laplanche, and Dolan, Plaintiffs purchased LendingClub common stock at artificially inflated prices. As a series of partial but inadequate disclosures were issued, the price of LendingClub's securities substantially declined.

295.    At the time of the material misrepresentations alleged herein, Plaintiffs were ignorant of their falsity, and believed Defendants' statements to be true. Had Plaintiffs known the truth with respect to the business, operations, performance and prospects of LendingClub, which was concealed by LendingClub, Laplanche, and Dolan, Plaintiffs would not have purchased LendingClub common stock, or if they had purchased such securities, they would not have done so at the artificially inflated prices that they paid.

296.    By virtue of the foregoing, Defendants LendingClub, Laplanche, and Dolan have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

297.    Plaintiffs have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for LendingClub stock. Plaintiffs would not have purchased LendingClub stock at the prices they paid, or at all, if they had been aware that the market prices (or values) had been artificially and falsely inflated by Defendants' misleading statements.

298.     Taking into account, *inter alia,* tolling of the limitations period by the filing of the class action complaint against Defendants in the matter *In re LendingClub Securities Litigation*, 16-cv-02627-WHA (N.D. Cal.), Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein.  Consequently, this action is timely.

**SECOND CAUSE OF ACTION**

**Violations of Section 20(a) of the Exchange Act**

**Against Defendants Laplanche and Dolan**

**(Regarding All Statements After May 16, 2013; regarding LendingClub Pre-IPO Common Stock and Post-IPO Common Stock)**

299.     Plaintiffs repeat and reallege each and every allegation contained in each of the foregoing paragraphs as if set forth herein.

300.     This Cause of Action is asserted against Defendants Laplanche and Dolan and is based upon Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

301.     Each of Defendants Laplanche and Dolan was at the time of the wrongs alleged herein a controlling person of LendingClub within the meaning of Section 20(a) of the Exchange Act.

302.     By virtue of their high level positions, and their ownership and contractual rights, substantial participation in, and/or awareness of, the Company's operations and/or knowledge of the materially false and misleading statements filed with the SEC and disseminated to the investing public, Defendants Laplanche and Dolan had the power to influence and control, and did in fact influence and control, directly or indirectly, the decision-making of the Company.

303.     Defendants Laplanche and Dolan were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged herein to be materially false and misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to

be corrected. In particular, Defendants Laplanche and Dolan each had direct and supervisory involvement in the day-to-day operations of the Company, and therefore are presumed to have had the power to control or influence the particular false and misleading statements and omissions giving rise to the securities violations alleged herein.

304.    By reason of the conduct alleged in the First Cause of Action, LendingClub is liable for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and Defendants Laplanche and Dolan are liable pursuant to Section 20(a) based on their control of LendingClub.

305.    Defendants Laplanche and Dolan are liable for the aforesaid wrongful conduct, and are liable to Plaintiffs for the substantial damages suffered in connection with their purchases of LendingClub securities.

306.    Taking into account, *inter alia,* tolling of the limitations period by the filing of the class action complaint against Defendants in the matter *In re LendingClub Securities Litigation*, 16-cv-02627-WHA (N.D. Cal.), Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein.  Consequently, this action is timely.

## THIRD CAUSE OF ACTION

### Common Law Fraud Against All Defendants
### (For All Statements, All Securities)

307.    Plaintiffs repeat and reallege each and every allegation contained in each of the foregoing paragraphs as if set forth herein.

308.    Defendants made, authorized or caused the representations and/or omissions set forth above.

309.    Those representations and omissions were material.

310.    The material representations set forth above were knowingly made by such Defendants with the intent to deceive, and such Defendants' representations omitted and concealed material statements of fact from Plaintiffs.

311.     Each such Defendant knew its representations were false and/or misleading, and their omissions were material and rendered their representations misleading, at the time they were made or omitted.

312.     Defendants knew that Plaintiffs would receive and rely on such representations, and intended that their false and/or misleading statements would induce Plaintiffs to purchase LendingClub securities at inflated prices.

313.     Plaintiffs reasonably and justifiably relied on such misrepresentations and omissions. Plaintiffs would not have purchased LendingClub securities at all, or at the prices they paid, had they known the truth.

314.     As a direct and proximate result of such reliance, and these Defendants' fraudulent misconduct, Plaintiffs have suffered damages.

315.     This action is brought within three years of discovery of the facts constituting the fraud – that, in fact, Defendants had misrepresented LendingClub's internal controls and numerous aspects of the Company's operations and financial results – and is therefore timely under California law.

316.     Plaintiffs did not, and could not, have discovered Defendants' acts of fraud unless and until the truth began to be revealed via a series of disclosures from May 9th through 16th 2016, and Defendants' misrepresentations began to be revealed and corrected.

## FOURTH CAUSE OF ACTION

### Negligent Misrepresentation Against All Defendants

### (For All Statements, All Securities)

317.     Plaintiffs repeat and reallege each and every allegation as if set forth herein.

318.     Defendants authorized or caused the representations and/or omissions set forth above.

319.     Defendants supplied false information for use by Plaintiffs in making investment decisions.

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS AND THE COMMON LAW

320.    Defendants had no reasonable grounds for believing the representations were true when made.

321.    Defendants had a duty to exercise reasonable care and competence in providing information about LendingClub to Plaintiffs.

322.    Defendants made misrepresentations that they knew, or should have known, to be false in order to induce investors, including Plaintiffs, to purchase LendingClub securities.

323.    Defendants breached their duty to exercise reasonable care in making these misrepresentations to Plaintiffs.

324.    Plaintiffs reasonably and justifiably relied on such misrepresentations. Plaintiffs would not have purchased LendingClub securities at all, or at the prices they paid, had they known the truth.

325.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered damages.

### FIFTH CAUSE OF ACTION

**Fraudulent Inducement**
**Against Defendants LendingClub and Laplanche**

**(For Preferred Series D Stock)**

326.    Plaintiffs repeat and reallege each and every allegation as if set forth herein.

327.    Plaintiffs purchased from LendingClub shares of Preferred Series D Stock, certificated as Certificate PD-012.

328.    Plaintiffs purchased the shares of Preferred Series D Stock as of January 31, 2012, and received their certificates on or about May 31, 2012.

329.    For those statements made on or before January 31, 2012, Defendants made, authorized or caused the representations and/or omissions on or before set forth above.

330.    In particular, Defendants made, authorized, or caused the representations and/or omissions in the Series D Agreement, and in the Form 10-Ks for 2010 and 2011, as well as in the interim Forms 10-Q.

331.    Those representations and omissions were material to Plaintiffs' purchase of Preferred Series D Stock.

332.    The material representations set forth above were knowingly made by such Defendants with the intent to deceive, and such Defendants' representations omitted and concealed material statements of fact from Plaintiffs.

333.    Each such Defendant knew its representations were false and/or misleading, and their omissions were material and rendered their representations misleading, at the time they were made or omitted.

334.    Defendants knew that Plaintiffs would receive and rely on such representations, and intended that their false and/or misleading statements would induce Plaintiffs to purchase LendingClub securities at inflated prices.

335.    Plaintiffs reasonably and justifiably relied on such misrepresentations and omissions. Plaintiffs would not have purchased LendingClub Preferred Series D Stock, or would not have paid the prices they paid, had they known the truth.

336.    Plaintiffs were fraudulently induced into purchasing LendingClub Preferred Series D Stock.

337.    As a direct and proximate result of such reliance, and these Defendants' fraudulent misconduct, Plaintiffs have suffered damages.

338.    This action is brought within three years of discovery of the facts constituting the fraudulent inducement – that, in fact, Defendants had made misrepresentations to Plaintiffs – and is therefore timely under California law.

339.    Plaintiffs did not, and could not, have discovered Defendants' acts of fraud unless and until the truth began to be revealed via a series of disclosures from May 9th through 16th 2016, and Defendants' misrepresentations began to be revealed and corrected.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request relief and judgment, as follows:

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS AND THE COMMON LAW

(a)     Awarding compensatory damages against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

(b)     Awarding Plaintiffs punitive damages;

(c)     Awarding Plaintiffs their attorneys' fees and costs; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury as to all issues so triable.

Dated: May 16, 2018

Respectfully submitted,

/s/ Katie R. Glynn

**LOWENSTEIN SANDLER LLP**
Katie R. Glynn (Bar No. 300524)
390 Lytton Avenue
Palo Alto, CA 94301
Telephone: 415-288-4545
Fax: 415-288-4534
kglynn@lowenstein.com

Lawrence M. Rolnick (*pro hac vice to be filed*)
Marc B. Kramer (*pro hac vice to be filed*)
1251 Avenue of the Americas
New York, NY 10020
Telephone: 212-262-6700
Fax: 973-597-2381
lrolnick@lowenstein.com
mkramer@lowenstein.com

*Counsel for the Valinor Plaintiffs*

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS AND THE COMMON LAW